VIRGIL PIERCE, APPELLANT, V. CITY OF OGALLALA, NEBRASKA,
A MUNICIPAL CORPORATION, ET AL., APPELLEES.

378 N.W.2d 140

Filed December 13, 1985.   No. 84-475.

Gregory J. Beal of Gregory J. Beal & Associates, P.C., for appellant.

Paul D. Merritt, Jr., of McGinley, Lane, Mueller, O'Donnell & Merritt, P.C., for appellee City.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, and GRANT, JJ.

GRANT, J.

Appellant, Virgil Pierce, filed this action seeking disability retirement benefits under the pension and retirement plan of the City of Ogallala, Nebraska (hereinafter City). Pierce had received a 40-percent vesting percentage based upon his time with the police force under the plan but, in this action, sought 100 percent vesting based upon the provision of the plan for 100 percent vesting if an employee was injured, rendered incapable of fully performing his duties, and, therefore, terminated. The action was filed against the City and Republic National Life Insurance Company (hereinafter Republic). Republic issued its policy containing a retirement plan to the City. Each defendant,

after filing demurrers, answered, and each defendant moved for summary judgment. The trial court sustained both motions. Appellant now seeks review only of the summary judgment entered in favor of the City. We reverse and remand for further proceedings.

In the first 15 paragraphs of his second amended petition, Pierce pled the existence of a policy issued by Republic to the City providing for pension and retirement benefits to persons "regularly employed by Participating Employer [the City] whose employment is in the Police Department of the Participating Employer . . . ." Pierce further pled that the City had discharged him from employment as a police officer "due to disability," that the City had applied to Republic for benefits for Pierce, but that in preparing such application the City had not consulted with Pierce as to his medical condition nor informed Republic of that condition, although the City knew that Pierce was disabled. Pierce further alleged that Republic had informed him, after his discharge, that the determination of disability under the policy rested solely with the City and that if the City had determined that Pierce was disabled, Pierce would have been entitled to 100 percent vesting under the pension plan rather than the 40-percent vesting allowed to him by Republic based on the information furnished to Republic by the City.

Pierce then alleged that the City "was obligated to the employee as a third party beneficiary . . . of the policy" to perform the City's duty, as a fiduciary under the policy, to make the determination whether plaintiff was disabled under the terms of the policy and that the City had breached "its contractual duty to Plaintiff." Pierce sought damages "against Defendant," and further pled: "That to the extent that the Defendant, Republic . . . has any obligation towards the Plaintiff, or to the other Defendant, the City . . . the Court should include as part of its judgment, a requirement that the said Defendant pay over such funds to the Defendant, City . . . or to the Plaintiff . . . ."

In his "Second Cause of Action," Pierce alleged that the City, "as plan trustee or plan administrator," owed a duty to secure for its employees all benefits to which the employee

might be due under the plan and that the City had, either intentionally or negligently, breached that duty. Pierce alleged that the City was negligent in failing to make a determination that he was disabled when the City forwarded the application to Republic for Pierce's benefits; in failing to advise him as to available options under the plan; in failing to certify that he was disabled under the terms of the policy; and in failing to state in the application for benefits that plaintiff was disabled as defined in the contract between the City and Republic.

In its answer to Pierce's petition, the City alleged that on December 12, 1978, Pierce was notified by Howard C. Greene, the City's chief of police, and the chairman of the city council that his employment was terminated effective December 26, 1978, and that on December 18, 1978, Pierce was notified by letter from Greene that he had "reconsidered" his action and Pierce was not terminated and was expected to return to duty after his doctor released him. The City further alleged that "subsequent to September [sic; obviously meaning December] 18, 1978, and prior to December 26, 1978," Pierce notified the City that he had taken another job and would not return to his employment with the City's police department. The City further alleged that on January 18, 1979, the city clerk for the City sent a "Termination, Notice and Request" to Republic setting out Pierce's termination date as January 1, 1979, and that on March 6, 1979, the city clerk mailed a "retirement refund check" from Republic to Pierce in the amount of $17,111.31, which represented "his contribution" under the plan. The City also alleged that when it delivered "the refund of employee contribution" to Pierce, the City understood that it was settling all rights which Pierce might have against the Republic policy and that when Pierce accepted the check as payment in full, the resulting "accord and satisfaction is a bar to Plaintiff's recovery . . . ." The City further alleged that by his acceptance of the Republic check, Pierce was estopped from claiming any further interest in the pension plan.

The City and Republic each moved for summary judgment. A hearing was held on the motions. The City and Pierce submitted evidence in the form of affidavits and depositions. Republic submitted no evidence. The trial court then found that

there was "no showing that [Pierce had been] 'terminated,' as required by Article II, Section 7" of the Republic group annuity contract, and there was "no showing that the Plaintiff's 'impairment' (based upon 'competent medical opinion'[)] would 'render him incapable of performing his duties,' as an Ogallala police officer, as required by said Article II, Section 7."

The trial court then sustained each motion and ordered that Pierce's second amended petition be dismissed. Pierce appeals only from the sustaining of the City's motion for summary judgment.

The evidence submitted by Pierce and the City at the hearing on the City's motion for summary judgment showed the following.

Pierce began his employment with the City on June 9, 1966, as a police officer. As a patrolman, Pierce's duties included: "Enforcing all state statutes, city ordinances . . . protecting the people in the city of Ogallala . . . . Investigating accidents, any bar room brawl calls . . ., assisting the ambulance crews, assisting the state patrol officers if . . . requested to do so, making arrests with warrants and so forth."

On July 1, 1974, the City and Republic entered into a group annuity contract which provided disability and retirement benefits to members of the City's police department. Pierce was a "participant" in the contract program from its beginning.

On January 8, 1977, while on duty, Pierce injured his back, while assisting an ambulance crew, when he lost his footing on some icy steps while helping to transport a heavy, unconscious man from an upstairs apartment. Pierce experienced pain in his lower back and right leg. He consulted a doctor and was hospitalized from January 10 to January 17, 1977. Pierce was then referred to Dr. Frederick Teal on or about March 19, 1977. In April 1977 Dr. Teal performed surgery on Pierce in a Denver hospital to remove a ruptured disk. Pierce continued under Dr. Teal's care until December 2, 1977.

In June of 1977 Pierce was allowed to return to part-time duty as a patrolman on a restricted basis. While the restrictions continued to apply, he returned to full-time duty on December 2, 1977. Pierce testified that he returned to full-time duty

without restrictions and was fully capable of performing his duties on January 1, 1978. As of December 2, 1977, Dr. Teal rated appellant as "8 percent permanently physically impaired as a working unit."

Pierce was injured a second time on July 14, 1978. On his arrival at work that day, Pierce stated, he entered the darkened officers' equipment room, stumbled over some floormats, and fell in a twisting motion. He experienced lower back pain and pain in his legs and immediately was taken by the chief of police for medical attention. Pierce was hospitalized in Ogallala for 14 days and then consulted a partner of Dr. Teal's on August 8, 1978. Dr. Teal hospitalized Pierce and performed a myelogram on August 29, 1978. Pierce was discharged on August 31. Pierce was readmitted to the hospital and underwent further surgery on September 9. He was discharged from the hospital on September 14. Pierce returned to work as a patrolman on a part-time basis, with restrictions, on November 20, 1978.

During the entire course of Pierce's treatment for the injuries of January 8, 1977, and July 14, 1978, Dr. Teal had sent medical reports and evaluations to the City's workmen's compensation insurance carrier, Cornhusker Casualty Company. That company, in turn, kept the City informed by sending them copies of much of the company's correspondence concerning those injuries.

The chief of police of the City and the chairman of the city council sent a letter to Pierce on December 12, 1978, stating: "This is to notify you that your employment with the Police Department of the City of Ogallala, Nebraska, is hereby terminated effective December 26, 1978." The chief of police stated in his deposition that at the time he sent the letter he doubted if Pierce could fulfill his duties as a patrolman. Before the chief of police had notified Pierce of this termination, the law firm representing the City sent a letter to Chief Greene stating that "the letter of termination to Virgil Pierce . . . should not contain any reasons for the termination, but should simply be a statement that it is a notice of termination of employment . . . ." The letter further stated that "[i]f Virg contacts you regarding the reasons for his termination, your response should be along the lines that we discussed on the phone. That is, his

dismissal results from his physical inability to perform all the duties required of a police officer."

On December 14, 1978, after he received this letter, Pierce obtained employment in an Ogallala business, to begin January 15, 1979. In his deposition Pierce stated that the prospective employer hired him to work at the counter in an auto parts store. Pierce stated that the work was light and that his prospective employer was aware of Pierce's physical condition and requested him to obtain a release from his doctor.

Chief Greene sent another letter to Pierce on December 18, 1978. In this letter Greene stated:

> This is to advise you that I have reconsidered the action which is the subject of my letter to you dated December 13, 1978.
>
> That letter resulted from a misunderstanding as to whether you were still under a doctor's care. In light of the fact that you are still under the care of a doctor, please be advised that it is not the wish of myself or the City of Ogallala to terminate your employment.
>
> However, in light of the fact that there will be no part-time work available for you after Christmas, please be advised that I will expect you to remain at home, beginning December 26, until you have been released by your doctor to return to your regular duties as a patrolman for the Ogallala Police Department.
>
> My apologies for the misunderstanding. If you have any questions, please feel free to contact me.

Sometime after receiving the letter of December 18, 1978, Pierce wrote a letter to Greene stating that after Pierce received the termination letter and before he had received the "reconsideration" letter, he had accepted another job "because employment is necessary to meet the family needs." Pierce declined what he termed the "offer."

On a date not shown, Greene sent to the city clerk the following interdepartmental correspondence:

> DUE TO THE FACT THAT OFFICER VIRGIL PIERCE HAS TURNED ALL EQUIPMENT ISSUED TO HIM AND HAS ACCEPTED EMPLOYMENT ELSE WHERE AS HE INDICATED IN A LETTER

GIVEN TO ME ON JANUARY 1, 1979. I BELIVE [sic] THAT HE HAS QUIT AND RESIGNED HIS EMPLOYMENT JUDGING FROM WHAT THE LANGUAGE UTILIZED IN THE LETTER INDICATES.

MR. V. PIERCE IN THE LETTER STATES, "IT DOES NOT APPEAR THAT I WILL BE ABLE TO ACCEPT YOUR OFFER AND I RESPECTFULLY DECLINE IT WITH ALL DUE RESPECT TO THE POLICE DEPARTMENT, YOURSELF, AND ALL OF THE PERSONNEL THAT I HAVE ENJOYED WORKING WITH FOR MANY YEARS," AND THIS I WOULD REGARD AS HIS NOTICE OF TERMINATION AND DECLINE OF THE OFFER THAT HE RETURN TO FULL TIME STATUS PER THE LETTER OF DECEMBER THE 18TH, 1978.

On or about January 19, 1979, the city clerk applied to Republic for Pierce's benefits. In this application the city clerk indicated that Pierce's date of employment was June 9, 1969, his date of termination was January 1, 1979, and Pierce's contribution was $2,786.10. The application did not, in any way, indicate that Pierce was disabled at all. Based on this information, Republic forwarded to the City, for delivery to Pierce, its check for $17,111.31. This amount represented a 40-percent vesting in Pierce based on Pierce's time with the police force while under the plan. Pierce cashed the check.

While Pierce assigned three errors below, he has briefed only one; therefore, we consider only the assigned error that was discussed in his brief. Neb. Ct. R. 9D(1)d (rev. 1983). Pierce assigned as error the granting of summary judgment to the City, thereby dismissing his claim against the City.

As noted above, at the time of submission of the City's motion for summary judgment, Pierce's petition presented two "causes of action"; one in contract seeking recovery from the City under the theory that Pierce was a third-party beneficiary under the agreement between the City and Republic, and the other seeking recovery against the City on the theory that the City was negligent toward Pierce in submitting an application to Republic for Pierce's benefits under the annuity contract.

Whether Pierce's allegations are properly causes of action or theories of recovery and whether the petition presents a misjoinder of contract and tort actions are questions not before us. We are presented only the problem of the correctness of the trial court's granting the City's motion for summary judgment. Before summary judgment may be granted, the court must determine there is no genuine issue as to any material fact or as to the ultimate inferences to be drawn therefrom and that the moving party is entitled to judgment as a matter of law. *Mayer v. Howard*, 220 Neb. 328, 370 N.W.2d 93 (1985); *Witherspoon v. Sides Constr. Co.*, 219 Neb. 117, 362 N.W.2d 35 (1985).

In making that determination on a motion for summary judgment, we stated in *Witherspoon v. Sides Constr. Co., supra* at 119, 362 N.W.2d at 39, "the evidence is to be viewed most favorably to the party against whom the motion is directed, giving to that party the benefit of all the favorable inferences which may reasonably be drawn from the evidence."

Based on those holdings, we first examine the trial court's determination that there was no showing that Pierce was terminated as required by article II, § 7, of the contract between the City and Republic. That section provides in part:

SECTION 7. DISABILITY BENEFITS

If a participant is terminated prior to his Normal Retirement Date as a result of a medically determinable physical or mental impairment, which on the basis of competent medical opinion may be expected to result in death or to be of long, continued duration and which renders him incapable of performing his duties, he shall be 100% vested in the benefits which have been paid for on his behalf at such time of disability.

None of the words in the phrase "terminated prior to his Normal Retirement Date" are defined in the agreement between the City and Republic. Whatever the precise meaning of "terminated," however, the City used the word in its letter of December 12, 1978, to Pierce when it said "your employment . . . is hereby terminated effective December 26, 1978," and the meaning was clear to both the City and Pierce. At that point it might well be said that there was no genuine issue as to that material fact, but the necessary conclusion is that Pierce was

terminated, not *not* terminated. Such a conclusion, of course, would support Pierce's position, not the City's, and could not be the basis of granting summary judgment to the City.

The letter of December 12, 1978, however, is not the sole evidence as to termination. In the City's letter of December 18, 1978, the chief of police informed Pierce that the chief had "reconsidered" his action and that it was "not the wish of myself or the City of Ogallala to terminate your employment." The effect of this "reconsideration" letter, when considered together with the facts that Pierce had sought and accepted another job after the City's first letter, Pierce's actions in turning in his equipment to the police department, and the memo of the chief of police to the city clerk characterizing his "reconsideration" letter as an "offer," presents a factual issue that could not be the subject of a motion for summary judgment.

The other issue determined by the trial court was based on the court's finding that there was "no showing that the Plaintiff's 'impairment' (based upon 'competent medical opinion'[)] would 'render him incapable of performing his duties,' as an Ogallala police officer . . . ." As to that question, the City views as conclusive a note signed by Pierce's physician, Dr. Teal, on December 28, 1978, as follows: "TO WHOM IT MAY CONCERN: Virgil Pierce may return to work as of January 15, 1979." As noted in the City's brief at 20, "This form contained no restrictions and TEAL assumed that it would be relied upon by an employer." In its brief the City also notes that Dr. Teal testified, at the time of his deposition, that he was under the impression that Pierce was employed as a police officer. If that were all the testimony and evidence on this issue, there would have been no question of fact, and the motion for summary judgment would be properly granted.

The evidence on the question, however, was not confined to the doctor's note on a 6- by 3-inch slip of yellow paper. Five such slips were introduced as exhibits, and none contained any reference to restrictions. One note of May 11, 1977, in connection with Pierce's first accident, stated that Pierce would not return to work until June 1, 1977, and that a later determination would be made whether he would be able to

return to "full duty." (Emphasis in original.) Another note of November 15, 1978, stated that Pierce could "return to work on a part-time basis . . . as of November 20, 1978, for a period of six weeks." This note covered the times in question—that is, Pierce's "termination" of December 12, 1978, his "reconsideration" of termination of December 18, 1978, and his acceptance of what he described as a counterman's position, filling orders for automotive parts.

There were other of Dr. Teal's reports received at the time of his deposition that indicated that Pierce's medical situation was not fully described in the brief note of December 28, 1978. A "Doctor's Supplemental Report" furnished by Dr. Teal to Cornhusker Casualty Company on December 26, 1978, indicated that the doctor's prognosis "As to Permanent Disability" would be reevaluated in February, while stating Pierce could return to work on January 1, 1979.

As to Dr. Teal's deposition statement that he thought Pierce was to return to his employment as a police officer when he signed the December 28, 1978, slip, the doctor's office notes indicate to the contrary. Those notes state that in Pierce's visit to the doctor on December 15, 1978, "Patient has been relieved of his job as of 26th December with no plans for further employment. . . . I recommended that he see me in late Feb. for follow-up."

Further, in other deposition testimony, Dr. Teal made numerous references to Pierce's condition, including the doctor's opinion that after Pierce's second surgery in 1978, while some of Pierce's duties as a police officer would be compatible with his condition, there were certain duties "that would definitely be contraindicated, those being, being in a situation where he would have to confront a suspect and become involved physically in subduing a suspect . . . ." The doctor then expanded the list of contraindicated activities to include lifting in excess of 50 pounds and riding in a patrol car for extended periods.

Dr. Teal also testified that Pierce's impairments "being permanent in nature, yes, I would expect them to be of long duration."

Considering Dr. Teal's deposition testimony in conjunction

with article II, § 7, of the agreement between the City and Republic, we hold there is a genuine issue of material fact as to whether Pierce was terminated "as a result of a medically determinable physical . . . impairment, which on the basis of competent medical opinion may be expected . . . to be of long, continued duration and .which renders him incapable of performing his duties . . . ." The judgment is therefore reversed and the cause remanded for further proceedings.

The presentation of this appeal raises another issue in this case. On appeal it is the duty of Pierce, as appellant, to cause the transcript to be prepared. See Neb. Ct. R. 4 (rev. 1983). Rule 4A specifies what the transcript shall contain: the pleadings on which the case is tried, the judgment or order appealed from, the instructions given, a copy of the supersedeas bond (if any), and "[s]uch, and only such, other parts of the record as are necessary to include for the proper presentation of the assigned errors in this court."

In the case at bar Pierce's attorney caused a 265-page transcript, full of multiple copies of documents and irrelevant filings, to be prepared. The letter of transmittal of the transcript from the clerk of the district court to this court contained the language that the attorney for the appellant "insisted that I follow his Praecipe and forward a copy of all filings of any nature by any of the parties in my Court." As a result, the transcript included, inter alia, (1) four copies of the annuity plan, (2) the petition, first amended petition, and second amended petition, (3) demurrers and briefs on demurrers, (4) a witness list, and (5) irrelevant preliminary motions.

Neb. Ct. R. 14B(2) (rev. 1983) states: "When unnecessary costs have been made by either party, the court may order the same to be taxed to the party making them, without reference to the disposition of the case." Accordingly, the cost of the transcript filed in this court is taxed to appellant. Since these costs are the direct result of the actions of Pierce's attorney, the attorney is ordered to reimburse his client for such costs.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

SHANAHAN, J., not participating.